UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

LIBERTY MUTUAL FIRE INSURANCE CO., :
LIBERTY INSURANCE CORP., LIBERTY
MUTUAL INSURANCE CO., LIBERTY :
COUNTY MUTUAL, THE FIRST LIBERTY
INSURANCE CORP., LIBERTY MUTUAL MID- :
ATLANTIC INSURANCE CO., LIBERTY
MUTUAL INSURANCE CORP., PEERLESS INS. :
CO., AMERICAN STATES INSURANCE CO.,
GENERAL INSURANCE CO. OF AMERICA, :
SAFECO INSURANCE CO. OF AMERICA, AND :
SAFECO INSURACE CO. OF INDIANA

:

            Plaintiffs,

:

    -against-

:

ISAAC SHAPSON, SERGE DELALEU, M.D., :
IQBAL PERVAIZ QURESHI, M.D., MATTHEW :
PHILLIP GOTTLIEB, D.C., RALPH ROBERT
BONOCORE, D.C., IGORE VATELMAN, L.AC., :
SD MEDICAL, P.C., P.R. MEDICAL, P.C.,
GOTTLIEB FAMILY CHIROPRACTIC, P.C., :
GOODHEART CHIROPRACTIC, P.C.,
ELEMENT ACUPUNCTURE, P.C., NORTMED :
MANAGEMENT, INC., JOHN DOES 1-20 AND :
ABC CORPS. 1-20,

:

            Defendants.

------------------------------------------------------------ x

MEMORANDUM & ORDER

13-cv-5046 (ENV) (PK)

VITALIANO, D.J.

    Plaintiffs Liberty Mutual Fire Insurance Co., Liberty Insurance Corp., Liberty Mutual

Insurance Co., Liberty County Mutual, The First Liberty Insurance Corp., Liberty Mutual Mid-

Atlantic Insurance Co., Liberty Mutual Insurance Corp., Peerless Ins. Co., American States

Insurance Co., General Insurance Co. Of America, Safeco Insurance Co. Of America, and Safeco

1

FILED
IN CLERK'S OFFICE
US DISTRICT COURT

☆ MAR 29 2016

BROOKLYN OFFICE



Insurace Co. Of Indiana (collectively, "Liberty Mutual") filed this complaint seeking a judgment,

pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that plaintiffs have no duty to pay Isaac

Shapson, Serge Delaleu, M.D., Iqbal Pervaiz Qureshi, M.D. (Delaleu and Quereshi collectively

the "defendant doctors"), Matthew Phillip Gottlieb, D.C., Ralph Robert Bonocore, D.C. (Gottlieb

and Bonocore collectively the "defendant chiropractors"), Igore Vatelman, L.Ac., SD Medical,

P.C. ("SD Medical"), P.R. Medical, P.C. ("PR Medical"), Gottlieb Family Chiropractic, P.C.

("Gottlieb Chiro"), Goodheart Chiropractic, P.C. ("Goodheart Chiro") (SD Medical, PR Medical,

Gottlieb Chiro, and Goodheart Chiro collectively the "PC defendants"), Element Acupuncture,

P.C. ("Element Acupuncture"), Nortmed Management, Inc. ("Nortmed"), John Does 1-20, and

ABC Corps. 1-20, on any pending or future claims for no-fault insurance-related billed

healthcare services.

Liberty Mutual alleges that defendants wrongfully misrepresented that they were solely

owned by properly licensed healthcare professionals, and were, in fact, splitting fees with

unlicensed persons. Additionally, Liberty Mutual charges that defendants had engaged in

kickback schemes with certain healthcare operators. Shapson and Nortmed, together, as well as

Qureshi, SD Medical, and PR Medical, together, now move to dismiss the complaint, pursuant to

Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, to stay this action pending

referral of the claims to New York state no-fault insurance regulatory authorities.[1] Allstate

Insurance Company, Government Employees Insurance Company, Progressive Northeastern

---

[1] Defendants Bonocore, Goodheart Chiro, and Delaleu never answered or otherwise responded to
the complaint, and the Clerk of Court has issued Certificates of Default as to each. ECF Dkt. No.
42, 43, 60. On April 4, 2014, the Court dismissed defendants Vatelman and Element
Acupuncture in accord with a stipulation of voluntary dismissal. ECF Dkt. No. 48.

Insurance Company, and Property Casualty Insurers Association of America were permitted to file an *amici curiae* brief in support of Liberty Mutual's opposition to the motions to dismiss. For the reasons that follow, the motions are denied in their entirety.

Background[2]

Liberty Mutual's constituent entities bringing suit are Massachusetts, Illinois, New Hampshire, and Indiana corporations licensed to issue automobile insurance policies in New York. Complaint, ECF Dkt. No. 1 ("Compl.") at ¶¶ 55-68. Plaintiffs maintain that they are generally required by law to reimburse eligible injured persons ("EIPs"), meaning those who have been injured in automobile accidents and who are eligible beneficiaries of insurance coverage under no-fault insurance policies. *Id.* at ¶ 107; N.Y. Ins. Law §§ 5101-5109; 11 N.Y.C.R.R. §§65-1–65-5. An EIP, under New York's no-fault laws, may assign his or her no-fault benefits to providers of healthcare services, such as the PC defendants. *Id.* at ¶ 108. Pursuant to assignments of this kind, the PC defendants—domestic professional service corporations sharing an office in Queens—have submitted bills to Liberty Mutual seeking payment for healthcare services they claim that they provided to assignor EIPs. *Id.* at ¶¶ 123-127.

Liberty Mutual alleges that Shapson, a layperson not licensed to practice medicine or any profession in New York, as well as others unknown to it, orchestrated a scheme to fraudulently obtain no-fault insurance benefits for medical services claimed on billing submitted by SD Medical, PR Medical, Gottlieb Chiro, and Goodheart Chiro. *Id.* at ¶¶ 1-2. Shapson, it is alleged,

---

[2] All facts are taken from the complaint, and, solely for purposes of this motion, are deemed true unless otherwise noted.

with the assistance of doctors Delaleu, Qureshi, and chiropractors Gottlieb, and Bonocore, fraudulently created, owned, incorporated and licensed professional corporations in violation of New York law limiting the ownership of such corporations to professionals. *Id.* at ¶¶ 2-3. The purpose of defendants' scheme, plaintiffs allege, was to engage in unlawful fee-splitting with Shapson, a nonprofessional, and a billing company not named as a defendant here. *Id.* at ¶¶ 3-5. Plaintiffs also claim that defendants engaged in kickback schemes, receiving payments in exchange for referrals, with a number of healthcare providers, including Element Acupuncture and its record owner, Vatelman. *Id.* at ¶ 6.

Further, Liberty Mutual contends that, though the PC defendants were owned by the defendant doctors and chiropractors "on paper," Shapson and others "purchased or otherwise were permitted to use the name and license" of doctors Qureshi and Delaleu, and chiropractors Gottlieb and Bonocore, who had, in reality, "abdicated any true beneficial ownership interest therein." *Id.* at ¶¶ 11-17, 20. This practice, Liberty Mutual says, violates Article 15 of New York's Business Corporation Law ("BCL"), which prohibits a professional corporation that provides medical services to be owned and controlled by anyone other than the licensed professionals employed to provide such service. *Id.* at ¶¶ 21-22. In addition, Nortmed, a corporation owned and operated by Shapson, entered into agreements with the PC defendants "to ostensibly provide management and administrative services, office space, and medical and office equipment and/or other supplies." *Id.* at ¶ 26. These agreements, however, were "used to engage in unlawful fee-splitting and funnel[ed] hundreds of thousands of dollars in fraudulently obtained insurance payments to [Shapson and others] through Nortmed." *Id.* These actions were similarly in violation of New York statutory law prohibiting the sharing or splitting of fees

4

between professionals and nonprofessionals, thereby rendering defendants ineligible to recover no-fault benefits. *Id.* at ¶¶ 30-36.

In the end, Liberty Mutual pleaded, Nortmed, and its owner, Shapson, by and through agreements ostensibly providing management/administrative services and office space/equipment, was "the vehicle to control all of the Shapson PCs' operations and to funnel fraudulently obtained insurance payments to themselves." *Id.* at ¶ 137.  Shapson and others, plaintiffs allege,

> exercised control over all aspects of the [PC defendants], from
> billing to preparing and creating medical reports, to signing
> medical records, to hiring all physical therapists, medical doctors,
> chiropractors, and other employees and support staff to work for
> the [PC defendants], to collecting on the medical bills submitted to
> insurance companies, to scheduling the purported services the
> Defendant Doctors and/or Defendant Chiropractors would provide
> that were billed to insurance companies, to making personnel
> decisions, to retaining attorneys to pursue No-fault collections on
> behalf of the [PC defendants], to retaining other professionals such
> as accountants, to establishing relationships with the providers to
> whom the [PC defendants] referred its "patients" for health
> services, to controlling the bank account(s) opened in the name of
> the [PC defendants], to determining what disbursements would be
> made from the Shapson PCs' accounts and to whom and for how
> much, to determining what agreements would be entered into on
> behalf and/or in the name of the [PC defendants] and to controlling
> and managing all other aspects of the finances of the [PC
> defendants].

*Id.* at ¶ 141.  These agreements, they claim, were also cover for an alleged kickback scheme, in which Vatelman, the owner of Element Acupuncture, "paid kickbacks disguised as 'rent' to Nortmed in order to receive referrals from one or more of the [PC defendants] and be able to 'treat' patients" in the shared office space, without regard to medical necessity. *Id.* at ¶¶ 39-40.

5

It is well-established in New York, Liberty Mutual alleges, that "insurers may withhold no-fault reimbursement from fraudulently incorporated enterprises." *GEICO v. Uptown Health Care Mgmt., Inc.*, 945 F. Supp. 2d 284, 291-92 (E.D.N.Y. 2013) (citing 11 N.Y.C.R.R. § 65-3.16(a)(12); *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 319-20, 794 N.Y.S.2d 700, 827 N.E.2d 758 (2005)). Indeed, New York law plainly and unequivocally requires that all professional service corporations licensed to practice medicine be owned and controlled by licensed physicians only. To incorporate such an entity, the certificate of incorporation must not only list the names of all shareholders, directors, and officers, but must also include documentation certifying that such individuals are licensed to practice medicine in New York. *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 282 (E.D.N.Y. 2013) (citing N.Y. Bus. Corp. Law §§ 1503, 1507, 1508). If these formalities are not observed, the professional corporation is treated as "fraudulently incorporated," and is without lawful authority to submit assigned claims for no-fault insurance benefits. *Id.* (citing N.Y. Educ. Law § 6512; N.Y. Penal Law § 175.10; *Mallela*, 4 N.Y.3d at 319-20).

## Standard of Review

Under the well-established *Twombly* standard, a trial court should dismiss a complaint for failure to state a claim only if it does not contain enough factual allegations to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Although a court must accept as true all allegations contained in the complaint, and at this stage draw all reasonable inferences in the plaintiff's favor, it need not accept legal conclusions couched as facts or threadbare recitals of the elements of a cause of

6

action that are supported by merely conclusory statements. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). Determining whether a plausible claim for relief is stated is a context-specific task that requires the motion court to "draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950). If the court is satisfied that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," then the court must grant dismissal pursuant to Rule 12(b)(6). *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). The question for resolution is "not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

## Discussion

Defendants advance myriad scattershot arguments as to why Liberty Mutual's claims must fail. Shapson and Nortmed move to dismiss on the grounds that Liberty Mutual has failed to allege the existence of an enterprise that is separate and distinct from the alleged pattern of racketeering activity, and that it does not plead the alleged acts of mail fraud, or common law fraud, with the requisite degree of particularity required by Rule 9(b). They also join in the motion by Qureshi, SD Medical, and PR Medical to dismiss on the ground that this action lies fundamentally in breach of contract, not RICO, and they request, alternatively, for a stay pursuant to the doctrine of primary jurisdiction.

7

I.    RICO

Defendants attack the sufficiency of Liberty Mutual's allegation that a racketeering

conspiracy existed.  To sustain a civil RICO claim, a plaintiff must satisfy the elements of the

criminal RICO statute, set forth at 18 U.S.C. § 1962(c).  Pleading sufficiency is first tested by

Rule 8(a).  *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d Cir. 2014).[3]

Specifically, a plaintiff must properly plead that: "(1) that the defendant (2) through the

commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5)

directly or indirectly invests in . . . or participates in (6) an 'enterprise' (7) the activities of which

affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.

1983).  And, of course, RICO "'can be applied in . . . harmony with the State's [insurance]

regulation.'" *Elzanaty*, 916 F. Supp. 2d at 297 (quoting *Humana, Inc. v. Forsyth*, 525 U.S. 299,

307-08, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999)).

The satisfactory pleading of the underlying fraud needs no long-winded explanation.

First, an "enterprise," for purposes of RICO, is defined as "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity." *See* 18 U.S.C. § 1961(4).  Given such breadth, clearly, "any

legal entity may qualify as a RICO enterprise." *First Capital Mgmt., Inc. v. Satinwood, Inc.*, 385

F.3d 159, 173 (2d Cir. 2004); *see also Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 368

---

[3] While Rule 9(b)'s heightened pleading standard applies to allegations of fraudulent predicate
acts, such as violating the mail fraud statute, it "does not govern allegations of . . . RICO
conspiracy, which are subject only to the more liberal notice-pleading requirements of Rule 8."
*Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (citing *Pelman v. McDonald's
Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)).  That there are differing standards is, however,
academic.  If RICO conspiracy pleadings were subject to the more fulsome standard of Rule
9(b), Liberty Mutual's pleading would easily satisfy it.

(E.D.N.Y. 2012) ("That a RICO defendant is employed by the alleged corporate enterprise does not violate the distinctness rule because an employee of a corporation and the corporation are not the same entity.").

There simply can be no dispute that the four PC defendants constitute "enterprises," as defined by the statute, and are separate legal entities from the individual defendants: Dr. Delaleu, Dr. Qureshi, Shapson, Dr. Gottlieb, Dr. Bonocore and Vatelman. Defendants' contention that the Complaint asserts only "an association-in-fact enterprise for the sole purpose of obtaining No-fault payments" is a hollow mischaracterization. The complaint does not seek any relief relating to an association-in-fact enterprise. Compl. at ¶¶ 191-97, 208-14, 225-31, 242-48; Plaintiffs' Opposition to the Shapson Defendants's Motion to Dismiss, ECF Dkt. No. 50-6 ("Pl. Opp. to Shapson") at 11. Although informal associations can nonetheless be enterprises, "[i]n cases involving a legal entity, the matter of proving the enterprise element is straightforward, as the entity's legal existence will always be something apart from the pattern of activity performed by the defendant or his associates." *Boyle v. United States*, 556 U.S. 938, 955 (2009) (Stevens, J., dissenting). *See also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). As to this element, there are no shortcomings in the pleadings.

II.   Fraud

Painting with a broad brush, defendants argue that Liberty Mutual has, generally, failed to meet the heightened pleading standards of Rule 9(b), and that it otherwise cannot sustain the pleaded RICO claims by alleging violations of the mail fraud statute. Again, as a matter of law, just the opposite is true. To begin, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "[T]he allegations should 'specify the

9

time, place, speaker, and content of the alleged misrepresentations.'" *Protter v. Nathan's Famous Sys., Inc.*, 904 F. Supp. 101, 106 (E.D.N.Y. 1995) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)); *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). Pleadings must "explain how the misrepresentations were fraudulent and 'plead those events which give rise to a strong inference that the defendant[s] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)). Though plaintiffs must plead facts as to each defendant's role in the fraudulent enterprise, "[t]he purpose of Rule 9(b) is not to create a heavy burden for plaintiffs, but rather, to allow defendants to identify their alleged role and acts in the fraud to appropriately respond to the complaint." *Allstate Ins. Co. v. Ahmed Halima*, No. 06-CV-1316 (DLI), 2009 WL 750199, at *5 (E.D.N.Y. Mar. 19, 2009).

Rule 9(b)'s heightened pleading standard also "governs civil RICO complaints alleging predicate acts of mail fraud, wire fraud and bank fraud." *Leung v. Law*, 387 F. Supp. 2d 105, 112 (E.D.N.Y. 2005) (citing *Morrow v. Black*, 742 F. Supp. 1199, 1203 (E.D.N.Y. 1990)). Substantively, to be sure, there can be no disagreement that civil RICO claims may be predicated on mail and wire fraud given that "[t]he RICO statute defines 'racketeering activity' to include mail and wire fraud." *Turner v. N.Y. Rosbruch/Harnick, Inc.*, No. 12-CV-6256 (WFK) (RER), 2015 WL 500493, at *7 (E.D.N.Y. Feb. 3, 2015) (citing 18 U.S.C. § 1961(1)(B)). Mail fraud is defined as the knowing use of the postal system to "devise [or execute] any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1341. In practical lockstep with the pleading

10

burden Rule 9(b) imposes, "[w]here the RICO claim alleges mail or wire fraud, as is the case

here, a plaintiff must prove that defendants (1) participated in a scheme to defraud; (2) acted with

knowledge that the use of the mails or wires would follow in the ordinary course of business; and

(3) the mailing or the use of wires was for the purpose of executing the scheme or fraud alleged."

*Turner*, 2015 WL 500493, at *7 (quoting *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d

319, 333 (S.D.N.Y. 2003)) (internal quotation marks and brackets omitted).  However, where

"the mails or wires were used in furtherance of a master plan to defraud, as opposed to cases in

which the mailings themselves are alleged to be fraudulent, some courts have held that a detailed

description of the underlying scheme and the connection therewith of the mail and/or wire

communications is sufficient to satisfy Rule 9(b)."  *Id.* at *5 (quoting *USA Certified Merchs.*,

262 F. Supp. 2d at 332).

      A review of the complaint makes obvious that Liberty Mutual has met this burden by

having sufficiently pleaded mail fraud.  Facially and substantially, Liberty Mutual lays out a

cohesive account of conduct that is aggrieving and repetitive.  Its allegations include that

Shapson arranged for Dr. Delaleu and Dr. Quereshi to be the "paper" owners of the PC

defendants in order to operate their fraudulent scheme of submitting no-fault bills without legal

authority to do so.  Liberty Mutual also pleads how Shapson, Dr. Delaleu and Dr. Quereshi

executed the scheme by having the doctors use their licenses to incorporate the PC defendants

even though they were not actually operating those entities.  Rather, Shapson, from a building he

"rented" to the PC defendants, used Nortmed, a billing and office services provider, to incur

almost all the economic benefit generated from the no-fault claims submitted for payment.

Insurance fraud schemes, by nature, will ordinarily involve the mailing or wiring of fraudulent insurance claims and receipt by the same means of the proceeds of those claims, and as a consequence, it is foreseeable that the scheme will require use of the mails or wires. Plaintiffs annex to the complaint Predicate Act tables detailing the approximate mailing date for approximately 5000 fraudulent claim submissions. Liberty Mutual is not further required to "detail the injury suffered, including the nature of the claims in question, by the date of service, claim number, or even patient name[.]" *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 221 (E.D.N.Y. 2009). Additional elaboration at this stage of the litigation is unnecessary. Plainly, Liberty Mutual has sufficiently described the fraudulent scheme, how it satisfies the elements of a mail fraud charge, and how it has complied with the pleading requirements of 9(b).

III.   Breach of Contract

Defendants argue that this action lies fundamentally in breach of contract; a cause of action that trumps and defeats the RICO claims. The arguments are nonsensical. Seeking a first round knockout, Liberty Mutual presses no contract exists as to which a breach could be interposed, or to which a fraud claim could be related. All of the contracts that are the object of the litigation are between Liberty Mutual and the vehicle owners it insures. Plaintiffs' Opposition to PC Defendants's Motion to Dismiss, ECF Dkt. No. 50-5 ("Pl. Opp. to PC Defs.") at 7-9. In any case, Liberty Mutual points out, the asserted fraud claims are unrelated to any possible contract dispute. Even if plaintiffs could seek remedies under state contract law, moreover, such claims have no bearing on the RICO allegations "because the fraudulent conduct allegedly committed by the defendants ... is extraneous to any contract between Plaintiffs and

12

the [defendants] because it does not concern disputes over a contractual obligation between the parties." *Halima*, 2009 WL 750199, at \*8. In *Halima*, defendants were fraudulently incorporated medical corporations alleged to have given medically unnecessary tests. The court there found that valid claims for breach of contract "would not change the fact that Plaintiffs have pled distinct fraud claims that go well beyond contract claims." *Id.*

Manifestly, that contract rights or state law claims may exist does not foreclose a RICO fraud claim. *See Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 105 (2d Cir. 1993) (holding that "the existence of ... contractual 'rights' does not foreclose the plaintiffs' RICO fraud claims"); *U.S. Fire Ins. Co. v. United Limo. Serv., Inc.*, 328 F. Supp. 2d 450, 454 (S.D.N.Y. 2004) (noting that state law fraud or unjust enrichment claims often coexist with RICO claims, as they stem from similar predicate activity). Succinctly, a RICO claim can in no way be defeated by the existence of potential contractual rights or claims arising under state law.

IV.    Primary Jurisdiction

In a final Hail Mary attempt to oust plaintiffs of their chosen forum and claimed remedy, defendants contend that the question of whether the PC defendants were fraudulently incorporated and engaged in unlawful fee-splitting with nonprofessionals must be determined by the New York state departments of Financial Services, Health, and Education (the "state authorities") in conformity with the doctrine of primary jurisdiction. New York Insurance Law § 5109, they argue, allows for investigations of provider misconduct by the designated state authorities and de-authorization of medical providers from the no-fault system, and thus warrants

13

a stay of federal proceedings to allow a state investigation. This argument is wholly without merit, and it is on this point that the *amici* offer their insight.

Invocation of the doctrine of primary jurisdiction is not without set bounds. Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64, 77 S. Ct. 161, 165, 1 L. Ed. 2d 126 (1956) (citing *Gen. Am. Tank Car Corp. v. El Dorado T. Co.*, 308 U.S. 422, 431, 60 S. Ct. 325, 331, 84 L. Ed. 361 (1940)). Courts in the Second Circuit confronted by a request to invoke the doctrine have generally considered four factors: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006) (quoting *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006)). The doctrine is narrow in scope and rarely applied. *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988).

No technical expertise is required to determine whether a corporation was fraudulently incorporated. In any case, trial courts are extensively familiar with the exact type of fraudulent misrepresentations and RICO violations alleged here. *See, e.g., GEICO. v. Esses*, 12-CV-4424 (RJD), 2013 WL 5972481 (E.D.N.Y. Nov. 5, 2013); *Allstate Ins. Co. v. Howell*, 09-CV-4660 (RJD), 2013 WL 5447152 (E.D.N.Y. Sept. 30, 2013); *Elzanaty*, 916 F. Supp. 2d 273; *Allstate*

14

*Ins. Co. v. Bogoraz*, 818 F. Supp. 2d 544 (E.D.N.Y. 2011); *Grafman*, 655 F. Supp. 2d at 212;
*State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94 (E.D.N.Y. 2010); *Halima*, 2009
WL 750199. Given the volume of similar litigation that has wended its way through the district
courts before every, or nearly every, federal district judge in New York, it would be a startling
conclusion to find that such cases were, all this time, beyond the competence of these courts.
Neither is there any indication in the plain language of the statute, or the intent the words
implicate, that the designated state agencies's investigatory power be anything other than co-
extensive with properly commenced litigation. *See Allstate Ins. Co. v. Belt Parkway Imaging,
P.C.*, 78 A.D.3d 592, 592, 914 N.Y.S.2d 5 (1st Dep't 2010) (finding no indication in Section
5109's legislative history that the statute was intended to abrogate any of the rights conferred by
*Mallela*, allowing insurance carriers to withhold payments from fraudulently incorporated
enterprises).

     As to whether these claims lie particularly within the discretion of any appropriate state
authorities, there can be no doubt that New York's Department of Financial Services has a
vested interest in combatting no-fault insurance fraud, which it ranks among its top priorities.
No-fault insurance fraud is rampant and pervasive in New York, skyrocketing 1700% in the
period between 1992 and 2000. Amici Br. at 6 (citing *Med. Soc'y of N.Y., Inc. v. Serio*, 100
N.Y.2d 854, 861, 800 N.E.2d 728, 731 (2003). A report from the Financial Fraud and Consumer
Protection Division of the Department of Financial Services indicated that of all fraud reports
received by the division in 2015, 57% or 21,827 reports, involved suspected no-fault fraud. New
York State Dep't of Fin. Srvs. Fin. Frauds and Consumer Protection Rpt. (Mar. 15, 2016), at 16,
*available at* http://www.dfs.ny.gov/reportpub/fraud/ffcpd_annualrep_2015.pdf. Such claims

accounted for 89% of the total number of healthcare-related complaints received (12,891 of 14,452 claims). *Id.* at 29. That said, there is no indication that there is any particular discretion that courts would intrude upon by considering claims of the sort brought by Liberty Mutual. Such a finding is in no way intended, nor could it be, to diminish the reality that state agencies have laudably endeavored to combat this epidemic through increased investigations and regulatory action. These activities, however, have never before restrained courts from examining allegations, on behalf of insurers, that they were entitled to damages because medical providers had been fraudulently incorporated and received reimbursements to which they were not entitled. *See, e.g.*, *GEICO*, 2013 WL 5972481, at *7-10; *Elzanaty*, 916 F. Supp. 2d at 282-83, 295; *Bogoraz*, 818 F. Supp. 2d at 551-53. Especially in this light, the Court agrees with *amici* that the Department of Financial Services was never designed, nor has it been equipped, to be the sole gladiator fighting against tens of thousands of *noxii* each year. Try as it might, it cannot be reasonably expected to litigate the flood of claims and fully protect the rights of insurers, and the motoring public they serve, who have been defrauded by such racketeering activity. *See* Amici Br. at 9-12.

Of more import, defendants make no argument that courts and the Department of Financial Services would somehow work at cross-purposes. It is well established, quite to the contrary, that state law and its concurrent regulatory regime do not displace a RICO cause of action. Indeed, defendants' alleged failure to abide by state law easily supports the statement of a RICO claim. *Elzanaty*, 916 F. Supp. 2d at 297-98 (citing *Grafman*, 655 F. Supp. 2d at 225; *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 98-99 (E.D.N.Y. 2010); *AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 24 Misc. 3d 161, 167-68, 882 N.Y.S.2d 812, 818 (Sup. Ct.,

16

Nassau Cnty. 2009). Without quibble, "improper licensing of a [healthcare facility] may be a predicate act [of a RICO claim] because . . . it supplements, rather than disturbs, New York's insurance regime by providing another vehicle by which to carry forth the substantive policies of the State of New York," and, as a result, "allow[s] [the] RICO claim to go forward." *Elzanaty*, 916 F. Supp. 2d at 297 (quoting *Grafman*, 655 F. Supp. 2d at 225) (internal brackets and quotation marks omitted).

Finally, there is no danger of inconsistent rulings, as the inquiry involves a narrow factual dispute, not the interpretation of a broadly applicable rule or policy. *See Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 69 (2d Cir. 2002) (rejecting a primary jurisdiction stay related to medical licensing because "[t]he concern for consistency and uniformity is more prevalent in cases involving issues of broad applicability such as the reasonableness of rates or tariffs").

In sum, defendants have offered no compelling reason that primary jurisdiction applies or that a stay is appropriate.

### Conclusion

For the foregoing reasons, defendants's motions to dismiss and, alternatively, for a stay, are denied in their entirety.

The parties are referred to Magistrate Judge Peggy Kuo for her continued pretrial management of the proceedings.

So Ordered.

Dated: Brooklyn, New York
March 24, 2016

/S/ USDJ ERIC N. VITALIANO

ERIC N. VITALIANO
United States District Judge

17